## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| FORSYTH CONSULTING, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Case Number: 2:14-cv-02349-JHE |
| | ) | |
| ZOE'S KITCHEN, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Forsyth Consulting, Inc. ("Plaintiff" or "Forsyth") initiated this breach of contract action against Defendant Zoe's Kitchen, Inc. ("Defendant" or "Zoe's") in the Circuit Court of Jefferson County, Alabama. (Doc. 1-1). Zoe's removed the action to this Court based on diversity of citizenship, and it asserts counterclaims against Forsyth for tortious interference with business relations and breach of contract. (Docs. 1 & 6). The parties have filed cross-motions for summary judgment, and Forsyth has moved to strike. (Docs. 29, 33 & 55). The motions are fully briefed and ripe for review. (Docs. 29, 30, 33-35, 47-51, 55 & 57-61). For the reasons stated below, the court **DENIES** Forsyth's motion to strike, finds that Forsyth's motion for summary judgement is due to be **GRANTED IN PART** and **DENIED IN PART**, and finds that Zoe's motion for partial summary judgment is due to be **DENIED**.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 40).

# I. Standard of Review[2]

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-

---

[2] The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment. *See Gerling Global Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001). Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.1984) (citation omitted).

moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

This action arises from a dispute over an agreement between the parties for the provision of background music in Zoe's restaurants. Zoe's Kitchen, Inc. operates Mediterranean-inspired restaurants and originated as an Alabama corporation in 1995. (Doc. 28 at Exh. 2; Doc. 35 at 1, ¶ 1; Doc. 50 at 1, ¶ 1).[3] The Alabama corporation dissolved in April 2006, and Zoe's is now a Delaware corporation, which formed in October 2007. (Doc. 28 at Exh. 2). Forsyth Consulting is an Alabama corporation in the business of providing music and music-related services to restaurants and other businesses, and it is only licensed to do business in Alabama. (*Id.* at Exh. 1, pp. 20-21, 26).

Greg Dollarhyde, Zoe's former CEO, wanted to unify the music played in its restaurants, and he learned about Forsyth when he met Kevin Forsyth, its President. (Doc. 28 at Exh. 4, pp. 11, 13-14). Then, sometime prior to January 2009, Kevin Forsyth contacted Archie Andrews, Director of Construction for Zoe's, about providing music and music-related services to Zoe's

---

[3] All citations to the record refer to the document number as assigned by the Court's electronic filing system and the exhibit number, pagination, or paragraph number as assigned by the parties.

restaurants. (*See* Doc. 28 at Exh. 1, pp. 64-65; Exh. 3, p. 49; Exh. 5, p. 1). Forsyth presented

Zoe's with an agreement entitled Foreground Music Services Agreement and dated January 3,

2009 (the "Agreement"). (*Id.* at Exh. 5, p. 1). The Agreement provides in pertinent part as

follows:

> This Agreement is made this 3rd day of January, 2009 between Forsyth Consulting, Inc., an Alabama corporation, . . . (hereinafter called Company) and Zoe's Kitchen, Inc., an Alabama corporation, the owner and operator of (locations shown on Addendum A attached) . . . (hereinafter called Subscriber).
>
> Wherein it is mutually agreed:
>
> 1. Company hereby agrees to make available to Subscriber, at the above designated premises, the Company Program Service . . . . Subscriber agrees to and does hereby accept the Company Program Service . . . .
>
> 2. Company Program Service to be provided: digital internet controlled music service (2 zones) provided through Subscriber owned digital music server and speaker system. Company Program Service includes copyrighted music, internet based control of all programming features including all future updates, training, and custom programming assistance along with insertion of Subscriber provided WAV file ads. Any locations opened by Subscriber will install Company Program Service permitting Company to provide Proprietary Pricing of Company Program Service.
>
> 3. Subscriber hereby agrees to pay to Company . . . the following: \$[X][4] per location payable hereof at the beginning of each year during the term of this Agreement. . . .
>
> 4. This Agreement shall become effective on the commencement date indicated below and shall remain in effect for successive sixty (60) month periods unless terminated by either party at the end of any such period by written notice sent to the other by registered mail not later than ninety (90) days prior to the expiration thereof.[5] . . .

---

[4] Because this amount is "Confidential and Protected Information" subject to the protective order in effect in this action, (doc. 12), the undersigned has redacted it from this memorandum opinion.

[5] Paragraph 4 of the Agreement is an auto-renewal, or evergreen, clause. Zoe's standard practice was to strike such clauses in agreements it signed. (Doc. 28 at Exh. 4, p. 26). Forsyth testified that the purpose of the auto-renewal clause "is to notify [Forsyth] if [Zoe's] intend[s] to terminate at the end of that term." (*Id.* at Exh. 1, pp. 82-83).

[ . . . ]

11.  Entire Agreement:  All representations and promises of every kind are merged into this Agreement which constitutes the entire and only Agreement between the Subscriber and Company . . . and no modification or failure to enforce any of the provisions thereof shall be valid or deemed a waiver hereof unless made in writing and signed by an officer of Company.  . . .

Commencement Date:  March 1, 2009[6]

(Doc. 28 at Exh. 5, pp. 1-2) (emphasis in original omitted).

Kevin Forsyth drafted the Agreement without the help of an attorney, and he testified that the Agreement was one he used with other customers.  (*Id.* at Exh. 1, p. 63).  Andrews did not negotiate any changes to the Agreement before signing it.  (*Id.*).  Andrews signed the Agreement on January 4, 2009, on behalf of Zoe's, although he did not have express authority to execute contracts for Zoe's.[7]  (*Id.* at Exh. 4, pp. 15, 18; Exh. 5, p. 2).  No one else from Zoe's was present when Andrews signed the Agreement.  (*Id.* at Exh. 1, p. 64).  Along with executing the Agreement, Andrews also signed Addendum A to the Agreement, which listed Zoe's locations to receive music services from Forsyth.  (*Id.* at Exh. 5, p. 3).  Andrews executed revisions to Addendum A on March 4, 2009 and June 30, 2009; the revisions added new locations to receive music services from Forsyth.  (*Id.*).

Jason Morgan, Zoe's former CFO, learned about the Agreement after Andrews signed it; neither Morgan nor counsel for Zoe's reviewed the Agreement before it was executed.[8]  (*See*

---

[6] Based on the commencement date of the Agreement (March 1, 2009), February 28, 2014 was the last day of the initial sixty-month term of the Agreement, and November 30, 2013 was ninety days prior to the expiration of the initial term.  (*See* Doc. 28 at Exh. 5).

[7] Only three people had express authority to sign contracts on behalf of Zoe's in 2009: Greg Dollarhyde, its former CEO; Jason Morgan, its former CFO; and Kevin Miles, its current President and CEO.  (Doc. 28 at Exh. 4, pp. 10-11, 15).

[8] Morgan was Zoe's CFO from April 2008 until June 2015, and he reviewed the

Doc. 28 at Exh. 4, p. 18). Morgan informed both Andrews and Forsyth that Andrews did not have authority to sign the contract. (*Id.*, pp. 18-19). Morgan also testified that he told Forsyth that Zoe's was not bound by the Agreement because Andrews had signed it, but that Zoe's "agreed to honor" the Agreement. (*Id.*, pp. 23, 27). Between July 14, 2009 and December 16, 2009, Morgan signed at least six revised versions of Addendum A to the Agreement, which added new locations to be serviced by Forsyth. (*Id.* at Exh. 5). Morgan had authority to sign contracts and addenda to contracts on Zoe's behalf.[9] (*Id.*, pp. 15, 2).

Pursuant to the Agreement, Forsyth provided internet-based music programming, which is defined in the Agreement as the Company Program Service, for Zoe's restaurants. (Doc. 28 at Exh. 5, p. 1). The Company Program Service Forsyth provided was a product owned by American Music Environments ("AME"), and Forsyth was authorized to provide the AME product pursuant to the terms of a Distribution Agreement between Forsyth and AME. (*Id.* at Exh. 1, pp. 27-28, 31; Exh. 20). The Distribution Agreement set the price Forsyth paid to AME for the Company Program Service, which was less than the amount Forsyth charged Zoe's for the Service. (*Id.* at Exh. 20, p. 7). The Distribution Agreement also provided that all information contained in the agreement is proprietary and confidential, and it recognized all music service agreements between Forsyth and its customers are "proprietary in nature." (*Id.* at p. 4). Finally, the Distribution Agreement provided Forsyth with an exclusive right to sell the Company Program Service in Alabama and to certain "exclusive authorized chain accounts."

---

Agreement after it was executed and was aware of the auto-renewal clause in paragraph 4. (*Id.* at Exh. 4, pp. 9, 25).

[9] Morgan testified that "the addendums were only set to show the start date of . . . the service at each individual location . . ." and that the addenda "were how [Forsyth] invoiced [Zoe's] . . . ." (Doc. 28 at Exh. 4, pp. 21-22).

(*Id.* at pp. 1-2).

Forsyth initially provided the password to control the music programming to Dollarhyde and worked with Dollarhyde on the original music selections.  (Doc. 28 at Exh. 1, p. 69; Exh. 3, p. 56; Exh. 4, p. 11).   Additionally, although the Agreement did not provide for the sale or purchase of music equipment, Zoe's initially purchased the digital music servers for each of its locations from Forsyth.  (*See id.* at Exh. 1, pp. 94, 217; Exh. 5).   Finally, Zoe's installed the music services in the locations identified in Addendum A of the Agreement and paid Forsyth for the services.  (*See id.* at Exh. 4, pp. 31-32; Doc. 29 at ¶ 47; Doc. 47 at ¶ 47).

By 2012, Zoe's relationship with Forsyth had deteriorated because Zoe's found Kevin Forsyth difficult to work with, and Zoe's attempted to obtain the AME music services directly from AME or from another vendor.  (Doc. 28 at Exh. 3, pp. 60-61; Exh. 4, pp. 52-53; Exh. 10). Accordingly, in or around August 2012, Morgan told Kevin Forsyth that Zoe's was unhappy with its relationship with Forsyth and wanted to talk about lower pricing and getting the AME service from a different source.   (*Id.* at Exh. 4, pp. 51-53).   Around the same time, Randy Barnett, Zoe's Director of IT, called Kevin Forsyth and told him that Zoe's "was going to "bid out the music and sound systems," and Barnett also told him that Forsyth needed to lower its prices for the music services and equipment.[10]  (*Id.* at Exh. 1, pp. 163-164; Doc. 34 at Exh. A-23).   After Barnett talked with Kevin Forsyth, Morgan sent an email to Kevin Forsyth stating in part:

> [I]t appears [Zoe's has] a five year [A]greement that expires in January 2014.  I'm requesting that we relook at the [A]greement and that you give us your best price for the annual music service.  I'm open to extending the term, but would need to see a price savings.  Otherwise, we will do an RFP for music service and take the

---

[10] Barnett was not aware of the Agreement when he talked with Kevin Forsyth.  (Doc. 34 at Exh. A- 23).

best provider/price in January 2014.

(Doc. 28 at Exh. 13, p. 2).

Zoe's then bid out the provision of music equipment through a request for proposal ("RFP") process in October 2012, but it did not bid out the music services at that time.[11] (*Id.*; Doc. 28 at Exh. 4, p. 63; Doc. 34 at Exh. D-31). Forsyth participated in Zoe's RFP process for music equipment, but Zoe's did not select Forsyth's proposal; instead, selecting Advanced Pro Solutions ("APS") to provide its music equipment. (Doc. 28 at Exh. 1, pp. 157-59; Doc. 34 at Exh. A-8; Exh. A-23).

In 2013, Rachel Phillips-Luther, Zoe's Vice President of Marketing, took over responsibility for handling music services for its restaurants. (Doc. 28 at Exh. 4, p. 82; Exh. 7, pp. 9, 13). By mid-2013, Zoe's decided to do a RFP for music services at its restaurants.[12] (*See id.* at Exh. 7, pp. 27-28; Doc. 34 at Exh. A-26). Kevin Forsyth travelled to Dallas, Texas in August 2013, to meet with Kevin Miles, Zoe's President and CEO, to make a "pitch" for Forsyth's services. (Doc. 28 at Exh. 1, pp. 174-75; Exh. 3, p. 15). Miles testified that he and Kevin Forsyth discussed the RFP process during the meeting and that "[i]t was known in the RFP, that if he could not compete with others, then there would be a new contract with him or with someone else, so he fully understood that he either participated in that and won the business or didn't." (Doc. 28 at Exh. 3, pp. 94-96). At that time, Kevin Forsyth understood that Zoe's

---

[11] Although Zoe's did not do an RFP for music services in October 2012, Morgan testified that his August 2012 email made it clear that Zoe's was going to do an RFP for the music service. (Doc. 28 at Exh. 4, p. 63).

[12] Dollarhyde, Zoe's former CEO, sent Kevin Forsyth an email on July 10, 2013 stating in pertinent part, "[a]s to Kevin Miles[, Zoe's current CEO,] and Zoes, I spoke to him, as promised, and he intends to honor the AME purchase contracts through 2014. After that, it's up for bid." (Doc. 34 at Exh. A-26).

would honor the Agreement through the end of the initial term and after that the provider of music services would be up for bid. (*Id.* at Exh. 1, p. 175). However, Kevin Forsyth also testified that he was not sure if Zoe's music service provider after February 2014, would be determined by the RFP process. (*See id.* at p. 176). Additionally, Miles testified that the RFP process did not necessarily mean Zoe's would terminate the Agreement with Forsyth. (*Id.* at Exh. 3, p. 69).

Prior to August or September 2013, Phillips-Luther identified another potential vendor of music services, Ambiance Radio, LLC, and she provided it with the formal requirements of the RFP for music services. (*See* Doc. 28 at Exh. 7, pp. 27-28). Additionally, Phillips-Luther sent Kevin Forsyth an email in September 2013, stating in pertinent part:

> I have been working to secure a competitive overview of music services and to adequately compare all vendors I'd love the following:
>
> Summary of your approach to building play lists . . . Proposal for music services beyond our current agreement (which expires in Feb 2014). Proposal should include annual fee for service of two zones on existing players and cost to install new locations. . . . Please base on 3-year agreement.

(Doc. 34 at Exh. A-32).

Forsyth submitted a proposal to Phillips-Luther dated October 16, 2013, for the provision of music services beyond February 2014. (Doc. 34 at Exh. A-37). The proposal's logistics and pricing summary includes three different proprietary pricing options: (1) $775.00 per year for a sixty-month term; (2) $795.00 per year for a thirty-six-month term; or (3) $825.00 per year for a twenty-four-month term. (*Id.*). After receiving Forsyth's proposal, Phillips-Luther had a phone conversation with Kevin Forsyth in late 2013, to discuss the proposal and "demo the revised music selections[.]" (Doc. 28 at Exh. 7, p. 33). During the conversation, Phillips-Luther told Kevin Forsyth that the pricing in Forsyth's proposal was more than the other vendor's proposal

and that "if he couldn't come down on his pricing, that there was no way that [she] could even consider him for a new agreement[.]"[13] (*Id.* at Exh. 7, p. 34). Kevin Forsyth testified that Phillips-Luther did not tell him anything definitive during the conversation about the results of Zoe's RFP. (*Id.* at Exh. 1, pp. 192, 211-12). Kevin Forsyth sent a letter to Phillips-Luther dated January 13, 2014, referencing the proposal for services Forsyth submitted in October 2013, and stating that Forsyth's "proven track record along with over $400,575.00 in saving should provide [Zoe's] with the confidence to modify our existing Agreement going forward."[14] (Doc. 34 at Exh. A-49). After Plaintiff and Ambiance Radio submitted their proposals, Phillips-Luther eventually selected Ambiance Radio to provide music services for Zoe's restaurants.[15]

On February 3, 2014, Phillips-Luther sent Kevin Forsyth an email regarding music services and attaching documents entitled "Forsythe [sic] Consulting Notice" and "Transition Plan Music Services." (Doc. 28 at Exh. 14). Phillips-Luther's email states in full as follows:

> As you are aware, we have spent the better part of six months investigating and researching music solutions for Zoes Kitchen. AME/Forsythe Consulting has been a valued partner and we are appreciative of the energy, support and time invested in our business but we have identified an alternate service provider that can best suit our needs in the coming years.
>
> Please accept the attached letter as formal notice of termination of services.
> We are very appreciative of all you and your team have done to contribute to our success and wish you only the best in your future endeavors.

(*Id.*). The letter attached to the email reiterates that Zoe's identified an alternative provider of music services and states that "[p]er the [A]greement dated January 1, 2009 [sic], we will

---

[13] Phillips-Luther reviewed the Agreement at some time prior to November 2013. (Doc. 28 at Exh. 7, pp. 67, 69).

[14] Kevin Forsyth testified that if Zoe's selected Forsyth's proposal for music services his plan "was to create an addendum to [the Agreement.]" (Doc. 28 at Exh. 1, p. 192).

[15] Ambiance Radio currently provides music services to Zoe's restaurants. (Doc. 28 at Exh. 3, p. 24).

continue to open new locations and renewals with [Forsyth] through March 31, 2014. As of April 1st, new locations will no longer be serviced by [Forsyth]." (*Id.* at Exh. 15). Phillips-Luther drafted the letter without assistance, and she characterized it as a "transition letter" in her deposition. (*Id.* at Exh. 7, pp. 74-76).

The day after receiving the February 3, 2013 letter from Phillips-Luther, Forsyth sent a letter back to her expressing his surprise "to receive an email concerning early termination of music services" and stating that the Agreement required "a minimum ninety (90) day termination notice [] prior to expiration." (Doc. 28 at Exh. 16). The letter further states:

> Based on recent discussions and correspondence, cost-savings proposals presented last October, and the latest positive feedback regarding your preference for our music program, along with the recent executions of Addendums providing services to new locations, [Forsyth] believed it was your intent to continue services with Forsyth Consulting [].

(*Id.*).[16]

On March 27, 2014, Forsyth's former counsel sent letters to Ambiance Radio and APS, the company responsible for installing equipment and Ambiance Radio service in Zoe's restaurants. (Doc. 28 at Exhs. 17 & 18). The letters advise Ambiance Radio and APS that Forsyth has "a guaranteed, long-term contract to provide background music services to [Zoe's] at all existing and newly opened locations" and demand that Ambiance Radio and APS cease all activities with Zoe's. (*Id.*). This action followed.

### III. Analysis

Forsyth asserts two breach of contract claims against Zoe's based on allegations that Zoe's breached the Agreement by improperly terminating it in violation of paragraph 4 and by

---

[16] Forsyth testified that "it looked like [Defendant was] just gonna continue to work with [Plaintiff] because they continued to give us new locations that were opening through and past that time frame, which gave me hope." (Doc. 28 at Exh. 1, p. 192).

not paying Forsyth for certain invoices. (Doc. 1-1). For its part, Zoe's asserts two counterclaims against Forsyth: one claim for tortious interference with business relations based on the letters sent to Ambiance Radio and APS, and a second claim for breach of contract. (Doc. 6). In its counterclaim for breach of contract, Zoe's alleges Forsyth breached the contract by failing to provide it with training, custom programming assistance, and proprietary pricing for the music services, by improperly charging it for products and related services that were not authorized by the Agreement, and by failing to return overpayments received from Zoe's. (*Id.* at 15).

Forsyth seeks a judgment in its favor on its breach of contract claims and on both of Zoe's counterclaims, while Zoe's asks this Court for a judgment in its favor on Forsyth's breach of contract claims and on its breach of contract counterclaim against Forsyth. (Docs. 29 & 33). Because the parties' pending motions for summary judgment on the breach of contract claims and counterclaim present many of the same issues, the Court will address them together after first dispensing with Forsyth's motion to strike and discussing Forsyth's motion for summary judgment on Zoe's counterclaim for tortious interference with business relations.

### A. Plaintiff's Motion to Strike

As a threshold matter, the court must address Forsyth's motions to strike evidence attached to Zoe's brief in opposition to Forsyth's motion for summary judgment. (Doc. 55). With the December 1, 2010 rules change to Rule 56 of the Federal Rules of Civil Procedure, motions to strike submitted on summary judgment are no longer appropriate. Revised Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The Advisory Committee Notes specify as follows:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be

> admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

Fed. R. Civ. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments). "Before this amendment, parties properly challenged evidence used in a summary judgment motion by filing a motion to strike. The plain meaning of these provisions show that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily." *Campbell v. Shinseki*, 546 Fed. App'x 874, 879 (11th Cir. 2013).

Accordingly, the court construes Forsyth's motion to strike as objections to "the material cited to support or dispute" Zoe's facts on summary judgment. Because admissibility of evidence at the summary judgment stage does not affect admissibility at trial, the parties' arguments regarding Forsyth's objections will only be considered to the extent they address material cited for summary judgment purposes, and material successfully challenged will not be considered in the facts and analysis below.

Forsyth first objects to the declarations of Brian Pitkin, an employee of APS, and Rick Newberger, and employee of Ambiance Radio, arguing the declarations are inadmissible for summary judgment purposes because the statements in the declarations are conclusory. (Doc. 55 at 3). Contrary to Forsyth's assertions, even if the declarations are conclusory, that does not mean they are inadmissible; rather, if the declarations are conclusory, they simply have less probative value and may not be sufficient to defeat Forsyth's motion for summary judgment. *See Leigh v. Warner Brothers, Inc.*, 212 F.3d 1210, 1217-18 (11th Cir. 2000). Accordingly, this ground is insufficient to show that the declarations are inadmissible.

Next, Forsyth argues Pitkin's and Newberger's declarations are inadmissible because they are not based on personal knowledge. (Doc. 55 at 4). Both Pitkin and Newberger state they have personal knowledge of the facts stated in their declarations. (Doc. 48 at Exhs. F & G). Additionally, in their respective declarations, Pitkin and Newberger each state what position he holds at APS or Ambiance Radio and that he received and reviewed a letter from Forsyth's counsel demanding that APS or Ambiance Radio cease all business activities with Zoe's. (*Id.*). They each further state how the letter impacted his respective employer and its view of Zoe's business practices and reputation. (*Id.*).

The court cannot make credibility determinations in ruling on a motion for summary judgment and must take Pitkin's and Newberger's statements as true. *See, e.g., Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013); *Stewart v. Booker T. Washington, Ins.*, 232 F.3d 844, 850 (11th Cir. 2000). Moreover, there is nothing to suggest Pitkin and Newberger do not have personal knowledge about how letters addressed to them impacted their employers and their employers' relations with Zoe's. Forsyth has not shown the declarations are inadmissible because they are not based on personal knowledge.

Forsyth's objections to the declarations of Brian Pitkin and Rick Newberger are **OVERRULED**, and Forsyth's motion to strike is **DENIED**.

### B. Forsyth's Motion for Summary Judgment on Zoe's Counterclaim for Tortious Interference with Business Relations

Zoe's asserts a counterclaim against Forsyth for tortious interference with business relations based on allegations that Forsyth is liable for interfering with its business relationships with Ambiance Radio and APS. (Doc. 6 at 13-14). Forsyth moves for summary judgment on the claim, arguing that its alleged interference was justified and that, even if it was not, Zoe's cannot show it was damaged by Forsyth's interference. (Doc. 29 at 35-26).

To prove its claim of intentional interference with business relations, Zoe's must show: "(1) the existence of a protectable business relationship; (2) of which [Forsyth] was aware; (3) to which [Forsyth] was a stranger; (4) with which [Forsyth] intentionally interfered; and damage." *White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). Forsyth concedes that Zoe's can show the first four elements of the claim based on the March 2014 letters it sent to Ambiance Radio and APS demanding that they cease all their business activities with Zoe's. (Doc. 29 at 35-36; Doc. 28 at Exhs. 17 & 18). But, Forsyth argues, its interference was justified and, therefore, it cannot be liable for tortious interference. (Doc. 29 at 35).

Justification is an affirmative defense to a claim of tortious interference with business relations. *White Sands Group*, 32 So. 3d at 12. Determining if a party's interference is justified depends upon a balancing of several factors, including: "(a) the nature of the [party's] conduct, (b) the [party's] motive, (c) the interests of the other with which the [party's] conduct interferes, (d) the interests sought to be advanced by the [party], (e) the social interests in protecting the freedom of action of the [party] and the contractual interests of the other, (f) the proximity or remoteness of the [party's] conduct to the interference, and (g) the relations between the parties." *Id.* at 13 (quotations omitted). As is evident from the list of factors to be considered, determining if a party's interference with another's business relations was justified is a fact-intensive inquiry. Accordingly, "[j]ustification is generally a jury question." *Id.* at 18 (citations omitted).

Here, Forsyth argues, without citing to anything in the record, that its interference was justified in part because "[Forsyth] did not make any representations that it knew or believed to be false" in the March 2014 letters and because "[Forsyth's] motive for interfering was to protect its own contractual interest and to enforce the terms of its preexisting Agreement with [Zoe's]." (Doc. 29 at 36). Forsyth's argument is not sufficient to establish that there are no questions of

material fact regarding if its interference with Zoe's business relations was justified, especially because "[i]t has long been established that it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment." *Hardin v. Pitney-Bowes, Inc.*, 451 U.S. 1008, 1008 (1981) (Rehnquist, J., dissenting). Forsyth is not entitled to summary judgment on Zoe's counterclaim for tortious interference with business relations because its actions were justified.

Forsyth also argues that even if its actions were not justified, it is still entitled to summary judgment on Zoe's counterclaim because Zoe's cannot show that it was damaged by Forsyth's interference. (Doc. 29 at 36). "In Alabama, one who wrongfully interferes with the business relationship of another is subject to liability for '(1) the pecuniary loss of the benefits of the relation; (2) consequential losses for which the interference is a legal cause; (3) emotional distress or actual harm to reputation if either is reasonably to be expected to result from the interference; . . . and (4) punitive damages." *White Sands Group*, 32 So. 3d at 17 (internal citation and alterations omitted). The record shows Ambiance Radio did not terminate its relationship with Zoe's because of Forsyth's interference. (Doc. 28 at Exh. 7, p. 22). Therefore, there are no damages based on loss of the benefits of the relationship with Ambiance Radio, and Forsyth also asserts that Zoe's did not offer any evidence to show that it suffered any pecuniary or consequential loss, or harm to its reputation because of Forsyth's interference. (Doc. 29 at 37).

In opposition to Forsyth's motion for summary judgment, Zoe's offers the declarations of Brian Pitkin, APS's technical development manager, and Rick Newberger, the executive vice president of Ambiance Radio, to show that a jury could find that the letters Forsyth sent to APS and Ambiance Radio disrupted Zoe's business relations with them and injured Zoe's business

reputation. (Doc. 48 at Exhs. F & G). In Pitkin's declarations, he stated that the "letter placed [Zoe's] business practices and reputation in a bad light," (*Id.* at Exh. F, p.2); similarly, Newberger stated in his declaration that the letter "maligned [Zoe's] business practices." (*Id.* at Exh. G, p.2). Although this is not much evidence, Pitkin's and Newberger's declarations are sufficient under the summary judgment standard—which requires construal in the light most favorable to Zoe's, the nonmoving party here—to raise a question of fact regarding whether Zoe's suffered actual harm to its reputation based on Forsyth's interference. Forsyth is not entitled to summary judgment on Zoe's counterclaim for tortious interference with business relations.

### C. The Parties' Motions for Summary Judgment on the Breach of Contract Claims

Both parties move for summary judgement on the breach of contract claims Forsyth asserts and on the breach of contract counterclaim Zoe's asserts. (Doc. 29 & 33). Forsyth argues the undisputed facts establish that the Agreement is a valid contract between the parties, Forsyth performed its obligations under the Agreement, and Zoe's is liable for breaching the Agreement. (Doc. 29 at 15-34, 37-40). On the other hand, Zoe's argues it is not bound by the terms of the Agreement and, alternatively, even if the Agreement is a valid contract binding the parties, Forsyth breached its obligations under the Agreement while Zoe's fulfilled all of its obligations. (Doc. 19-38).

"The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding upon the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880

(Ala. 2009) (citing *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105 (Ala. 2002)).[17]  "The basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement."  *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 673 (Ala. 2001) (citations omitted).

### 1.  The existence of a valid contract binding the parties

The parties vigorously dispute whether the Agreement is a valid, enforceable contract. The disputed issues regarding the validity of the Agreement are (1) whether Zoe's is a party to the Agreement; (2) whether Andrews had apparent authority to bind Zoe's to the Agreement; (3) whether the parties agreed to the essential terms of the contract; and (4) whether Zoe's ratified the Agreement.[18,19]

---

[17] This court exercises diversity-of-citizenship jurisdiction over this matter; therefore, the court must apply the choice of law principles of Alabama, the forum state.  *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496 (1941); *St. Paul Fire and Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 895 n.1 (11th Cir. 2009) (citation omitted).  In contract disputes, Alabama applies the law of the state where the contract was formed unless a provision in a contract specifying which law governs.  *See id.*; *Cherokee Ins. Co. v. Sanches*, 975 So.2d 287, 292 (Ala. 2007).

Forsyth asserts that Alabama law should apply because the Agreement was made in Alabama.  (Doc. 29 at 15).  Zoe's does not directly dispute that assertion, but also asserts Texas law may apply because several of the addenda to the Agreement were executed in Texas.  (Doc. 35 at 20, n.4; Doc. 47 at 21, n.6).  However, the court need not determine whether Alabama or Texas law should apply to the interpretation of the Agreement because the parties have not identified an actual conflict between the relevant law of the two states, and the court has found no actual conflict between the relevant law.  *See Lemuel v. Admiral Ins. Co.*, 414 F. Supp. 2d 1037, 1049-50 (M.D. Ala. 2006) ("The first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions. . . . If there is no conflict between the competing bodies of law, . . . the court need not decide which state's law governs.") (citation omitted).

[18] In its brief in support of its motion for summary judgment, Zoe's first argues it is not bound by the Agreement because the parties had only an oral contract or a contract implied through a course of dealing.  (Doc. 35 at 21).  It relies on two cases to support its argument: *Davis v. Chapparo*, 431 S.W. 3d 717 (Tex. Ct. App. 2014) and *Kennedy v. Polar-BEK & Baker Wildwood Partnership*, 682 So. 2d 443 (Ala. 1996) (*per curiam*).  The facts in those two cases are materially different than the facts here, because there was no writing purporting to

### a. Is Zoe's a party to the Agreement?

In a series of related arguments, Zoe's argues the Agreement is not valid because Forsyth made its offer to the wrong entity, which rendered the offer defective, and further argues Zoe's is entitled to summary judgment on Forsyth's breach of contract claim because it is not a party to the Agreement. (Doc. 35 at 20-21; Doc. 47 at 18-20). Specifically, Zoe's asserts Forsyth made its offer to and entered into the Agreement with "Zoe's Kitchen, Inc., an Alabama corporation" ("Zoe's Alabama") and not Zoe's, which is a Delaware corporation formed in October 2007 that was not registered to do business in Alabama in January 2009 or February 2009. (*Id.*). Forsyth admits the Agreement incorrectly identifies Zoe's Kitchen, Inc. as an Alabama corporation and not as a Delaware corporation, but argues that mistake was simply an "excusable technical error" and the correct identity was apparent from the Agreement. (Doc. 29 at 21-22; Doc. 50 at 23-24).

The Agreement provides in pertinent part as follows:

> THIS AGREEMENT is . . . between FORSYTH CONSULTING, INC. an ALABAMA corporation, with offices located at 3332 OLD MONTGOMERY HIGHWAY, SUITE 216 – BIRMINGHAM, ALABAMA 35209 (hereinafter called COMPANY) and ZOE'S KITCHEN, INC. an ALABAMA corporation, the owner and operator of (LOCATIONS SHOWN ON ADDENDUM A ATTACHED) located at 2931 SECOND AVENUE SOUTH – BIRMINGHAM, ALABAMA 35223 Phone number (205) 414-9920 (hereinafter called SUBSCRIBER).

(Doc. 28 at Exh. 5, p. 1).

Based on the language of the Agreement, it does not specifically name Zoe's, i.e., Zoe's Kitchen, Inc., a Delaware corporation, as a party to the contract. (*See id.*). However, "[i]t is

---

memorialize the relationship between the parties in those cases. *See Davis*, 431 S.W. 3d at 719-22; *Kennedy*, 68 So. 2d at 445-46. Here, however, the Agreement is a writing that purports to memorialize the relationship between the parties, even though the parties vigorously dispute if it is a valid contract. The case law Zoe's cites regarding oral contracts or implied contracts is not persuasive.

[19] Zoe's did not offer argument or evidence to suggest the Agreement lacked adequate consideration. (*See* Docs 35 & 47).

well-settled that if the identity of the corporation otherwise appears, the failure to properly designate its proper residence, or the naming of one that is wrong, does not in any way affect the validity . . . of the instrument." 7 FLETCHER CYCLOPEDIA OF CORPORATIONS, § 3014. Undisputed evidence establishes that Zoe's Alabama dissolved in April 2006. (Doc. 28 at Exh. 2). While there is nothing to support Forsyth's contention that Zoe's "supplanted" Zoe's Alabama, Zoe's was the only entity named Zoe's Kitchen, Inc. with the authority to execute contracts in 2009 when Forsyth and Archie Anderson signed the Agreement. *See* 16A FLETCHER CYCLOPEDIA OF CORPORATIONS, § 8118 ("A dissolved corporation generally does not have authority to execute contracts."). In addition, Zoe's does not dispute that the Agreement was signed on behalf of Zoe's Kitchen, Inc. by its own Director of Construction. (Doc. 28 at Exh. 3, p. 49; Exh. 5, p. 2). Moreover, the Agreement lists the address of Zoe's Kitchen, Inc. as 2931 Second Avenue South, Birmingham, Alabama, which is Zoe's address rather than Zoe's Alabama's address, and Zoe's owned and operated restaurants at the locations identified in Addendum A of the Agreement. (Doc. 28 at Exhs. 2 & 5). Based on the language of the Agreement and undisputed evidence in the record, Zoe's proper identity is readily apparent from the Agreement. Accordingly, Zoe's is a party to the Agreement.

### b. Did Archie Anderson have authority to bind Zoe's to the Agreement?

Next, Zoe's argues its alleged acceptance of Forsyth's offer was defective and it is not bound by the Agreement because Archie Andrews, the individual who purported to sign the Agreement on its behalf, did not have actual or apparent authority to do so. (Doc. 35 at 22-24; Doc. 47 at 20-22). Forsyth admits Andrews did not have actual authority to sign the Agreement, but argues he had apparent authority to bind Zoe's to the Agreement. (Doc. 29 at 23-24; Doc. 50 at 25-27).

"Apparent authority 'is implied where the principal passively permits the agent to appear to a third person to have the authority to act on [its] behalf.'" *Kindred Nursing Centers East, LLC v. Jones*, 201 So. 3d 1146, 1154-55 (Ala. 2016) (quoting *Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc.*, 426 So. 2d 859, 861 (Ala. Civ. App. 1983)).  Accordingly, apparent authority may be implied when a principal "effectively acquiesced to and/or ratified" the action of the agent.  *Id.* at 1155.  However, an agent's own actions and statements are not sufficient to create apparent authority; rather, "[t]he apparent power of an agent is to be determined by the acts of the principal . . . ." *McLemore v. Hyundai Motor Mfg. Alabama*, LLC, 7 So 318, 329 (Ala. 2008) (quoting *Patterson v. Page Aircraft Maint., Inc.*, 283 So. 2d 433, 436 (Ala. Civ. App. 1973)).  Thus, to create a question of fact regarding whehter Andrews had apparent authority to execute the Agreement, Forsyth must point to evidence of some action on the part of Zoe's that cloaked Andrews with apparent authority to act on its behalf with respect to the Agreement.

Plaintiff argues Andrews had apparent authority to bind Zoe's to the Agreement in part because when it "initially approached [Zoe's] about providing music and music-related service to [Zoe's] business, [Forsyth] primarily dealt with [Greg] Dollarhyde[, Zoe's former CEO, and] Andrews.  (Doc. 29 at 23; Doc. 50 at 25).  However, Forsyth did not identify any action by Dollarhyde that could have reasonably led Forsyth to believe that Andrews had authority to sign the Agreement on Zoe's behalf.  Forsyth also argues that "by permitting [] Andrews to appear as though he was the proper party to sign the Agreement, Zoe's cloaked [him] with apparent authority to do so," but Forsyth fails to cite any evidence to support its argument or identify any specific action on the part of Zoe's that gave Andrews the appearance of authority.[20]  (Doc. 29 at

[20] Forsyth appears to argue that Zoe's decision to operate under the Agreement and not ask for a new agreement is evidence that Andrews had apparent authority to sign the Agreement

24; Doc. 50 at 25).  Additionally, Kevin Forsyth testified that no one but Andrews was present when he signed the Agreement in 2009.  (Doc. 28 at Exh. 1, p. 64).  Finally, Forsyth admits that after Zoe's learned of the Agreement, it informed Forsyth that Andrews did not have any authority to sign the Agreement.  (Doc. 29 at 24; Doc. 50 at 25).  Based on the evidence in the Rule 56 record, Forsyth has not shown there is a genuine issue of material fact regarding whether Andrews had apparent authority to execute the Agreement.  Rather, the evidence in the Rule 56 record establishes that Andrews did not have apparent authority to execute the Agreement; therefore, Andrews' signature was not sufficient to bind Zoe's to the Agreement.

### c. Did the parties agree to the essential terms of the Agreement?

Next, the parties dispute whether there was mutual assent to the essential terms of the Agreement.  Typically, mutual assent to the terms of a contract is evidenced by the signatures on the contract.  *See Dannelly Enterprises, LLC v. Palm Beach Grading, Inc.*, 200 So. 3d 1157, 1162 (Ala. 2016) ("'The purpose of a signature on a contract is to show mutual assent . . . .'") (quoting *Ex parte Rush*, 730 So.2d 1175, 1177-78 (Ala. 1999)).

Forsyth contends that the parties' signatures, including Forsyth's and Andrews' signatures on the Agreement and Jason Morgan's signatures on addenda to the Agreement, show there was mutual assent to the terms of the Agreement, while Zoe's argues there was no agreement regarding to the price term in the Agreement.  (Doc. 29 at 18-19; Doc. 47 at 22).  First, as discussed above, Andrews did not have authority to bind Zoe's to the Agreement; thus, his signature on the Agreement is not sufficient to show Zoe's assent to the terms of the

on behalf of Zoe's.  (Doc. 29 at 24; Doc. 50 at 26).  The Court finds that those arguments more properly relate to the issue of whether Zoe's ratified the Agreement; therefore, the Court addresses those arguments in section (C)(1)(d), pp. 24-25 *infra*.

Agreement. Next, Morgan, Zoe's CFO, signed several revisions to Addendum A of the Agreement and had actual authority to sign contracts on behalf of Zoe's. (Doc. 28 at Exh. 5 & Exh. 3, p. 48). Even though the addenda referred to the Agreement, it did not specifically adopt or incorporate the terms of the Agreement, and Morgan testified that he believed the purpose of the addenda was to identify the start date when Forsyth began providing service to Zoe's new locations. (*Id.* at Exh. 4, pp. 20-21). Thus, Morgan's signatures on the addenda are not sufficient to establish mutual assent as a matter of law, and there is a question of material fact regarding if there was mutual assent to the essential terms of the Agreement.

### d. Did Zoe's ratify the Agreement?

Finally, Forsyth argues that Zoe's ratified the Agreement and, therefore, the Agreement is an enforceable contract between the parties even if Andrews did not have authority to bind Zoe's to the Agreement, or if the parties' signatures are not sufficient to show mutual assent. (Doc. 29 at 19-20). Forsyth argues in part that Zoe's ratified the Agreement by having Morgan sign numerous revisions to Addendum A of the Agreement. (Doc. 29 at 20, 25; Doc. 50 at 27). Indeed, the record establishes that Morgan, who had actual authority to sign agreements on behalf of Zoe's, signed at least six addenda to the Agreement beginning in July 2009. (Doc. 28 at Exh. 5 & Exh. 3, p. 48). Each of the addenda is entitled "Addendum A attached to Agreement between Zoe's Kitchen, Inc. and Forsyth Consulting, Inc. dated: January 3, 2009." (*Id.* at Exh. 5). Thus, the addenda signed by Morgan specifically refer to the Agreement and are not "stand alone" documents, as Zoe's suggests. (*See* Doc. 47 at 23). As discussed above, however, Morgan testified that the only purpose of the addenda was to identify the start date when Forsyth began providing service to Zoe's new locations. (Doc. 28 at Exh. 4, pp. 21, 45-46). Therefore, Morgan's signatures on the addenda are not sufficient by themselves to establish that Defendant

ratified the Agreement.

Forsyth also argues Zoe's ratified the Agreement by abiding by its terms for almost five years after Andrews signed it. (Doc. 29 at 20; Doc. 50 at 27-28). On the other hand, Zoe's asserts that it repudiated the Agreement, but it did not cite to anything in the record to support that assertion. (Doc. 47 at 23). Although Morgan testified that he told Forsyth that Zoe's was not bound by the Agreement, he also testified that Zoe's was going to "honor" the Agreement, and he communicated in a September 2012 email to Forsyth that Zoe's was "bound by the contract." (Doc. 28 at Exh. 11; Exh. 4, Morgan Dep, pp. 23, 27, 65-66). Additionally, Kevin Miles, Zoe's President and CEO, communicated to Forsyth that he intended to honor the Agreement. (*See* Doc. 34 at Exh. A-28). Moreover, there is no dispute that after Zoe's learned about the Agreement signed on its behalf by Andrews, it continued to have Forsyth install the music service in its new locations and pay Forsyth the price specified in the Agreement for its services. (*See* Doc. 28 at Exh. 4, pp. 31-32; *See also* Docs. 29 & 35). Thus, Zoe's cannot show that it repudiated the Agreement. *See Lyles v. Pioneer Housing Systems, Inc.*, 858 So. 2d 226, 229 (Ala. 2003) ("It is well established that a plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions.") (citation, alterations and quotation marks omitted). Instead, the Rule 56 record shows that Zoe's ratified the Agreement by accepting benefits under the Agreement. *See Tuskegee Institute v. May Refrigeration Co., Inc.*, 344 So. 2d 156, 158 (Ala. 1977) ("'It is an established principle of the law of agency that where a person acts for another who accepts or retains the benefits or proceeds of his efforts with knowledge of the material facts surrounding the transaction, such other must be deemed to have [r]atified the methods employed . . . . This general principle applies, for example, to an unauthorized contract effected . . . .'") (quoting 3 Am. Jur.2d Agency § 175). Accordingly, the

Agreement is a valid contract binding the parties.

### 2. Forsyth's Performance Under the Agreement

Along with establishing that the Agreement is a valid contract, Forsyth must also establish its own performance under the Agreement to prove its breach of contract claim. *See, e.g., Shaffer*, 29 So. 3d at 880 (citation omitted). Conversely, Zoe's must establish that Forsyth did not perform its obligations under the Agreement to prove its counterclaim for breach of contract. *See id.* Zoe's argues it is entitled to summary judgment on Forsyth's breach of contract claims and on its counterclaim for breach of contract because Forsyth materially breached the Agreement, while Forsyth asserts the record establishes that it fulfilled all of its obligations under the Agreement. (Doc. 29 at 25-28, 38-40; Doc. 35 at 25-28).

The court must look to the terms of the Agreement to determine the parties' obligations under the Agreement and to determine whether Forsyth breached its obligations. "If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written. On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity." *Once Upon a Time, LLC v. Chappelle Prop., LLC*, -- So. 3d --, 2016 WL 3031347, *2 (Ala. 2016) (quoting *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000).

### a. Forsyth's obligation to provide Zoe's with proprietary pricing

Zoe's specifically argues Forsyth breached the Agreement by failing to provide it with proprietary pricing for the Company Program Service, while Forsyth strongly disputes that assertion. (Doc. 35 at 25-28; Doc. 47 at 33-34). Relative to Zoe's argument, the Agreement

states in pertinent part as follows:

1. [Forsyth] hereby agrees to make available to [Zoe's],[21] at the designated premises, the COMPANY PROGRAM SERVICE . . . .

2. COMPANY PROGRAM SERVICE TO BE PROVIDED:

   DIGITAL INTERNET CONTROLLED MUSIC SERVICE (2 ZONES) PROVIDED THROUGH SUBSCRIBER OWNED DIGITAL MUSIC SERVER AND SPEAKER SYSTEM. . . . ANY LOCATIONS OPENED BY SUBSCRIBER WILL INSTALL COMPANY PROGRAM SERVICE PERMITTING COMPANY TO PROVIDE PROPRIETARY PRICING OF COMPANY PROGRAM SERVICE.

3. SUBSCRIBER hereby agrees to pay to COMPANY . . . the following:

   []   An annual charge of $[X] PER LOCATION payable hereof at the beginning of each year during the term of this Agreement.

(Doc. 28 at Exh. 5, p. 1) (emphasis in original). The Agreement does not define "proprietary pricing;" accordingly, it is construed "according to the meaning a person of ordinary intelligence would reasonably give it." *Safeway Ins. Co. of Alabama, Inc. v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005) (citation omitted).

Zoe's asserts that based on the terms of the Agreement, "proprietary pricing" can only mean Forsyth's pricing with AME, or in other words, the same price AME charges Forsyth for the Company Program Service. (Doc. 35 at 26). Additionally, Morgan and Miles, Zoe's CFO and CEO, testified that they believed that the "proprietary pricing" language in the Agreement meant Forsyth was obligated to provide Zoe's with the same pricing it received from AME for the Company Program Service. (Doc. 28 at Exh. 3, p. 70; Doc. 28 at Exh. 4, pp. 97-98). According to Forsyth, "proprietary pricing" simply means the specific amount set forth in the Agreement, i.e., the annual charge of $X per location, which is more than the price AME

---

[21] Zoe's disputes if it was named as the Subscriber in the Agreement. *See*, pp. 19-21, *supra*.

charged Forsyth for the Company Program Service. (Doc. 50 at 28-30). Kevin Forsyth testified he considered Forsyth's annual charge per location to be a proprietary price because it was a rate developed for the account. (Doc. 28 at Exh. 1, pp. 32-33, 265-267).

Zoe's relies in part upon the Distribution Agreement to assert that the only pricing that was proprietary or confidential in this matter was the pricing between Forsyth and AME. (Doc. 35 at 26). However, that assertion is belied by the Agreement that Zoe's relies upon to support it. Although the Distribution Agreement provides that "[b]oth parties agree that all information contained in this Agreement . . . [is] proprietary and confidential," it also states that "[AME] acknowledges that all Distributor[22] Music Service Agreements and the rights and interests therein are proprietary in nature and are the sole and exclusive property of [Forsyth]." (Doc. 28 at Exh. 20, p. 4). Thus, the Distributor Agreement recognizes that Forsyth's Music Service Agreements, such as the Agreement at issue in this case, are proprietary, and it does not indicate that the only proprietary pricing is the price AME charges Forsyth for the Company Program Service. Next, Zoe's asserts that "[a]bsolutely nothing about the language of the [] Agreement suggests that it is confidential or proprietary," (Doc. 47 at 33), but the simple use of the term "proprietary pricing" could suggest that the Agreement's price term was proprietary.

Zoe's also argues that proprietary pricing as used in the Agreement can only mean the price AME charges Forsyth for the Company Program Service because a contract should be interpreted so "as to reconcile and to enforce all of its terms and not to ignore or disregard any of its terms so long as such an interpretation is not patently unreasonable." *Bruce v. Cole*, 854 So. 2d 47, 56 (Ala. 2003) (citations omitted). In particular, Zoe's asserts that paragraph 2 in the Agreement, which includes the term "proprietary pricing," "speaks to the price Forsyth agreed to

_____

[22] The Distribution Agreement defines Distributor as Forsyth. (Doc. 28 at Exh. 20, p. 1).

[charge] for additional locations that opened subsequently (i.e. Forsyth's 'proprietary pricing')," while paragraph 3 of the Agreement "speaks to the price [Zoe's] agreed to pay for the initial two locations for which Plaintiff agreed to provide services (i.e., $X per location)." (Doc. 35 at 26-27). There is nothing in the Agreement, however, that specifically indicates that the parties intended for a different price to apply for Forsyth's services at Zoe's new locations than the price that applied for Forsyth's services at the original two locations. (*See* Doc. 28 at Exh. 5). Indeed, the addenda to the Agreement simply list all of Zoe's locations to be serviced by Forsyth without differentiating between the original two locations and the additional locations that opened after the parties executed the Agreement. (*Id.*). Moreover, there is nothing in the record to suggest that Zoe's objected to paying the same annual price for Forsyth's services for all the locations identified in the revised addenda.

Zoe's also asserts that interpreting "proprietary pricing to mean $X per location would render the phrase 'proprietary pricing' superfluous[.]" (Doc. 35 at 27). However, a reasonable interpretation of the contract language is that the price term "$[X] per location" in paragraph 3 of the Agreement simply specified the amount equal to the proprietary pricing Forsyth would charge Zoe's based on Zoe's agreement to install the Company Program Service in its new locations. Thus, interpreting proprietary pricing to mean $X per location does not necessarily render the term superfluous.

Based on the foregoing, there is an ambiguity in the term "proprietary pricing" in the Agreement: it could refer to the price AME charges Forsyth for the Company Program Service, as Zoe's contends, or it could mean the $X per location specified in Paragraph 3 of the Agreement, as Forsyth contends. *See FabArc Steel Supply, Inc. v. Composite Const. Systems, Inc.*, 914 So. 2d 344, 357 (Ala. 2005) ("A contractual provision is ambiguous if it is reasonably

susceptible to more than one meaning."). "'It is well settled that where there is uncertainty and ambiguity in a contract, it is the duty of the court to construe the contract so as to express the intent of the parties.'" *Id.* at 358 (quoting *BellSouth Mobility Co. v. Cellulink, Inc.*, 814 So. 2d 203, 206 (Ala. 2001)). When the parties' intent is not clear from the language of the contract or the contract as a whole, a court or factfinder may look to "[t]he relations of the parties, the subject matter of the contract, and the object to be accomplished" to determine the parties' intent. *Id.* In this case, the parties' objective intent regarding the term "proprietary pricing" is not clear from the language of the Agreement or the Agreement as a whole. (*See* Doc. 28 at Exh. 5). Therefore, determining the parties' intent involves factual issues, and "the resolution of the ambiguity [is] a task for the jury." *See FabArc Steel Supply*, 914 So. 2d at 358 (citations omitted).

Because there is an ambiguity regarding the meaning of the term "proprietary pricing" in the Agreement, Forsyth has not established as a matter of law that it performed its obligation to provide Zoe's with proprietary pricing. Likewise, Zoe's has not established that Forsyth breached the Agreement as a matter of law by charging it a higher annual price for the Company Program Service than the price AME charged Forsyth for the Service or by failing to return the resulting overpayments it received from Zoe's. Instead, there is a genuine issue of material fact regarding whether Forsyth performed its obligation under the Agreement to provide Zoe's with proprietary pricing for the Company Program Service. Forsyth is not entitled to summary judgment on its claims for breach of contract, and Zoe's is not entitled to summary judgment on its counterclaim for breach of contract. [23]

---

[23] Zoe's also did not present any arguments in its brief in support of its motion for partial summary judgment related to its allegations that Forsyth breached the Agreement by failing to

### b. Forsyth's obligations to provide Zoe's employees with training and custom programming assistance.

Along with alleging that Forsyth breached the Agreement by not providing it with proprietary pricing, Zoe's counterclaim for breach of contract alleges Forsyth breached its obligations under the Agreement by failing to provide the required training and custom programming assistance to Zoe's employees. (Doc. 6 at p. 15). Forsyth argues it provided the required training and programming assistance and, therefore, did not breach the Agreement as Zoe's alleges. (Doc. 29 at 26, 38-39).

First, Forsyth argues it provided Zoe's with custom programming assistance by making changes to the "custom channel that was originally created by [] Dollarhyde" and by inserting several of Zoe's advertisements into the music rotation. (Doc. 29 at p. 26; Doc. 28 at Exh. 1, pp. 73-75). Zoe's did not respond to that argument in its opposition to Forsyth's motion for summary judgment, and Zoe's did not directly dispute Forsyth's assertion that it provided requested modifications to the custom music channel and inserted Zoe's advertisements in the music rotations at specified restaurant locations. (*See* Doc. 47, pp. 10, 33-35; Doc. 29 at ¶ 44). As a result, Zoe's has abandoned its claims that Forsyth breached the agreement by not providing Zoe's with custom programming assistance. *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("When a party moves for final … summary judgment, we have stated that 'it becomes incumbent upon the nonmovant to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in the moving party's favor.'") (quoting *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1264 (11th Cir. 2001))

---

provide the required training and custom programming assistance or by improperly charging it for products and related services which were not authorized by the Agreement; instead, Zoe's only argued that Forsyth breached the Agreement by failing to provide it with proprietary pricing and charging it a higher amount for the Company Program Service. (*See* Doc. 35 at 24-28).

(internal quotation marks and alterations omitted); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), *cert denied*, 516 U.S. 817 (1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). Thus, Forsyth is entitled to summary judgment on Zoe's breach of contract counterclaim to the extent the claim is based on Zoe's allegations Forsyth breached the agreement "[b]y failing to provide [Zoe's] with custom programming assistance[.]"

Next, Forsyth argues it fulfilled its obligations to provide Zoe's with training by supplying "[Zoe's] with any requested assistance on how to use the AME interface, including several full- and partial-length training sessions administered in-person or remotely." (Doc. 29 at p. 26 (citing Doc. 28 at Exh. 1, p. 69-73)). Although Zoe's did not directly respond to this argument in its brief in opposition to Forsyth's motion for summary judgment, it disputes the facts supporting Forsyth's argument that it fulfilled its obligation under the Agreement to provide training to Zoe's employees. (Doc. 47 at pp. 10, 33-35). Specifically, Zoe's asserts that Forsyth failed to provide training to general managers of Zoe's restaurants. (Doc. 35 at p. 13; Doc. 47 at p. 10; Doc. 28 at Exh. 7, pp. 18-19). It is not clear from the Agreement what training Forsyth was required to provide for Zoe's and its employees. (*See* Doc. 28 at Exh. 5). Accordingly, there is a question of fact regarding whether Forsyth breached its obligation to provide Zoe's employees with training by not providing training to the general managers of Zoe's restaurants. Forsyth is not entitled to summary judgment on Zoe's breach of contract counterclaim to the extent the claim is based on Forsyth's alleged failure to provide Zoe's employees with training.

### 3. Zoe's Performance Under the Agreement

#### a. Zoe's obligation to provide notice of its intent to terminate the Agreement

Zoe's argues it is entitled to summary judgment on Forsyth's breach of contract claim against it because the record establishes Zoe's performed its obligations under the Agreement. (Doc. 35 at 28-36; *See also* Doc. 47 at 24-29; Doc. 57 at 14-19).  According to Forsyth, however, the record shows Zoe's breached paragraph 4 of the Agreement, (Doc. 29 at 29-33; Doc. 50 at 31-37), which provides in pertinent part as follows:

> This Agreement shall become effective on [March 1, 2009] and shall remain in effect for successive sixty (60) month periods unless terminated by either party at the end of any such period by written notice sent to the other by registered mail not later than ninety (90) days prior to the expiration thereof.

(Doc. 28 at Exh. 5, pp. 1-2).  Kevin Forsyth testified that the purpose of this provision in the Agreement is "to notify [Forsyth] if [Zoe's] intends to terminate at the end of that term."  (*Id.*, at Exh. 1, pp. 82-83).

In general, a court will enforce a clear and unambiguous contract according to its terms. *Drummond Co., Inc. v. Walter Industries, Inc.*, 962 So. 2d 753, 780 (Ala. 2006) ("General contract law requires a court to enforce, as it is written, an unambiguous and lawful contract."). Additionally, "when an automatic-renewal provision is clear and unequivocal," it is enforceable as written. *Tidwell v. Pritchett-Moore, Inc.*, 12 So. 3d 83, 87 (Ala. Civ. App. 2008).  Here, the record establishes Zoe's did not terminate the Agreement by sending written notice to Forsyth by registered mail by November 30, 2013, which was ninety days prior to the expiration of the initial term of the Agreement.  (*See* Doc. 28 at Exh. 4, pp. 95-96).  However, Zoe's argues it was not required to send such notice because Forsyth had actual knowledge of Zoe's intent to terminate the Agreement prior to November 30, 2013.  (Doc. 35 at 28-36; Doc. 28 at Exh. 7, p. 78).  Accordingly, Zoe's essentially argues that it did not breach the Agreement because it fulfilled the essential purpose paragraph 4 and substantially performed its requirements under the Agreement.  (*See* Doc. 35 at 33-36).

"'Substantial performance of a contract does not contemplate exact performance of every detail but performance of all important parts. Whether a party has substantially performed a promise under a contract is a question of fact to be determined from the circumstances of each case.'" *Superior Wall and Paver, LLC v. Gacek*, 73 So. 3d 714, 721 (Ala. Civ. App. 2011) (quoting *Cobbs v. Fred Burgos Constr. Co.*, 477 So. 2d 335, 338 (Ala. 1985)). The parties dispute most of the facts regarding whether Zoe's substantially complied with its obligation to provide Forsyth with notice of its intent to terminate the Agreement at the end of the initial term.

First, Zoe's relies on written notes Kevin Forsyth prepared for himself to assert that Zoe's notified Forsyth as early as August 2012, of its intent to terminate the Agreement when its Director of IT, Randy Barnett, told Forsyth via email that "he was cancelling [Forsyth's] services and equipment purchases." (*See* Doc. 35 at 29 (quoting Doc. 34, Exh. A-23)). However, Kevin Forsyth's notes memorializing the email from Barnett go on to state that Barnett did not know about the Agreement. (Doc. 34, Exh. A-23). Additionally, Kevin Forsyth's notes indicate that he explained to Barnett that no other vendor could provide AME music services due to Forsyth's "exclusivity agreement" with AME and that Zoe's then bid out only Zoe's equipment purchases, and did not bid out the music services. (*See id.*). Thus, Kevin Forsyth's notes regarding his interactions and communications with Barnett do not show that Zoe's notified Forsyth of its intent to terminate the Agreement.

Next, Zoe's asserts that, beginning in August 2013, it communicated to Forsyth both verbally and in writing that the Agreement would not continue beyond its initial term. (Doc. 35 at 29). While Zoe's has produced evidence that it informed Forsyth of when the Agreement expired, it has not pointed to any evidence that it explicitly informed Forsyth in writing that it was terminating the Agreement at the end of the initial term. (*See* Doc. 28 at Exh. 13, p. 2; Doc.

34 at Exh. A-32). Forsyth admits that "[Zoe's] repeatedly notified [it] of when the initial term of the Agreement 'expired,'" but contends that notifying Forsyth of the end date of the initial term of the Agreement was not the same as notifying Forsyth that Zoe's intended to terminate the Agreement at the end of the initial term. (Doc. 50 at 31-32). In reply, Zoe's argues that Forsyth's admission establishes that it is entitled to summary judgment on Forsyth's breach of contract claim because notice regarding when the Agreement expired is the same as notice that the Agreement would terminate. (Doc. 57 at 14-19). Zoe's argument is called into question, however, by the testimony of its CFO, who distinguished between the end date of the Agreement and the termination of the Agreement. (Doc. 28 at Exh. 4, p. 57). Additionally, the language in paragraph 4 of the Agreement distinguishes between terminating the Agreement and its expiration by providing that the Agreement will remain in effect "<u>unless terminated</u> by either party . . . not later than ninety [] days <u>prior to the expiration</u> [of the sixty-month term]." (Id. at Exh. 5, p. 1) (emphasis added). Thus, when viewed in the light most favorable to Forsyth, Zoe's evidence that it gave Forsyth notice of the end date, or expiration, of the initial term of the Agreement does not establish that it gave Forsyth notice of its intent to terminate the Agreement.

Next, Zoe's contends that its RFP process for music services, in which Forsyth participated, gave Forsyth notice Zoe's was terminating the Agreement. (Doc. 35 at pp. 29-32; Doc. 47 at pp. 25-28). However, Kevin Forsyth testified he did not understand the Agreement was necessarily terminating at the end of the RFP process, and he indicated that his plan was to create an addendum to the Agreement if Zoe's selected Forsyth's proposal during the RFP process. (Doc. 28 at Exh. 1, pp. 175-76, 192). Moreover, Zoe's President and CEO also testified that the RFP process did not necessarily mean Zoe's would terminate the Agreement with Forsyth. (*Id.* at Exh. 3, p. 69).

In addition, the February 3, 2014 email and letter from Phillips-Luther to Forsyth belies Zoe's argument that its RFP for music services establishes that Forsyth knew Zoe's intended to terminate the Agreement. In its brief in support of its motion for summary judgment, Zoe's asserts that it "expects [Forsyth] to contend that Phillips-Luther's transition letter . . . was [Zoe's] effort at providing [Forsyth] with written notice of termination of the 2009 [] Agreement," and it further asserts that "regardless of how [Forsyth] interpreted the letter, . . . [n]o one testified that the letter was intended to formally 'terminate' the [A]greement with [Forsyth]." (Doc. 35 at 32-33). In making those assertions, Zoe's ignores the fact that Phillips-Luther and Zoe's President and CEO characterized the letter as a notice of termination or termination letter. Indeed, in Phillips-Luther's February 3, 2014 email sending the letter to Forsyth, she states, "[p]lease accept the attached letter as formal notice of termination of services." (Doc. 28 at Exh. 14). Additionally, Miles refers to the letter as a "termination letter" in a February 11, 2014 email to Phillips-Luther and other employees. (Doc. 28 at Exh. 7, pp. 74-75; Doc. 49 at Exh. 22, p. 1). In its summary judgment briefing, Zoe's does not address, much less attempt to explain, its prior characterization of the February 3, 2014 letter; instead, Zoe's insists that the letter was simply a "transition letter" intending to explain how it would handle the transition from Forsyth's services to Ambiance Radio. (*See* Doc. 35 at 32-33; Doc. 47 at 13). Despite how Zoe's may now characterize the letter, the emails referring to the February 3, 2014 letter as a "termination letter" or a "formal notice of termination of services" raise a question of fact regarding whether Zoe's intended for the letter to serve as a notice that it was terminating the Agreement with Forsyth. Thus, there is question of fact regarding whether Zoe's actually notified Forsyth of its intent to terminate the Agreement "not later than ninety [] days prior to the expiration" of the initial sixty-month term.

Viewing the evidence in the light most favorable to Forsyth, Zoe's does not meet its burden of proving that it fulfilled its obligations under paragraph 4 of the Agreement as a matter of law. The cases Zoe's cites, which are not binding precedent, do not compel a different result. Indeed, each of the three cases Zoe's cites for the proposition that "courts have admonished against a 'preoccupation with hypertechnicalities' in the form and manner of notice" of termination involved clear written notice of a party's intent to terminate an agreement or opt out of an arbitration agreement. *See New England Carpenters Central Collection Agency v. Labonte Drywall Co., Inc.*, 795 F.3d 271, 278 (1st Cir. 2015) (finding that defendant's letter expressed an unequivocal intent to terminate the collective bargaining agreement); *Bickerstaff v. SunTrust Bank*, 770 S.E. 2d 903, 908 (Ga. Ct. App. 2015) (finding that a complaint served on defendant provided notice of intent to litigate and opt out of an arbitration requirement), rev'd on other grounds, 788 S.E. 2d 787 (Ga. 2016); *Univ. Emergency Med. Found. v. Rapier Invs., Ltd.*, 1998 WL 34100601, (D.R.I. Oct. 16, 1998) (noting that written notice of termination sent by certified mail and received by the other party was sufficient to satisfy the requirements of the contract even though it was sent to a different address than the one specified in the contract). In this case, however, Zoe's has not come forward with clear written notice that unequivocally expressed its intent to terminate the Agreement at the end of the initial term. Instead, the evidence in the Rule 56 record shows a question of fact regarding whether Forsyth had actual notice of Zoe's intent to terminate the Agreement more than ninety days prior to the expiration of the Agreement and if Zoe's met its obligation to provide Forsyth with written notice of its intent to terminate the Agreement not later than ninety days prior to the expiration of the Agreement's sixty-month term.

**b. Equitable estoppel and wavier**

Zoe's argues that even if it breached the Agreement, Forsyth is equitably estopped from asserting that its notice of termination was ineffective and that Forsyth waived any alleged defects in Zoe's notice of termination. (Doc. 35 at 36-38; Doc. 47 at 29). "The purpose of the doctrine of equitable estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience." *Wehle v. Bradley*, 195 So. 3d 928, 939 (Ala. 2015) (citing *Pierce v. Hand, Arendall, Bedsole, Greaves & Johnston*, 678 So. 2d 765, 768 (Ala 1996)). For the doctrine of equitable estoppel to apply, a party must demonstrate that the person against whom estoppel is asserted asserts a claim that is inconsistent with his earlier action or inaction. *See id.* (citations and internal quotation marks and alterations omitted). Waiver applies when a party's course of conduct indicates "[a]n intention to waive a right," or when the party's conduct "is inconsistent with any other intention." *See Givens v. General Motors Acceptance Corp.*, 324 So. 2d 277, 279 (Ala. Civ. App. 1975).

Zoe's argues that equitable estoppel applies in this case because it "clearly expressed to [Forsyth] that it did not intend to continue the 2009 [] Agreement beyond its expiration date" and because "[Forsyth] never once gave [Zoe's] any indication . . . that the [A]greement was going to 'auto renew' on December 1, 2013[.]" (Doc. 35 at 37). Similarly, Zoe's argues that Forsyth waived its rights under the Agreement's notice provision because "[Forsyth] was aware that [it] did not intend to renew the Agreement past its expiration date[, and] . . . [Forsyth] never informed [Zoe's] of its belief that the [A]greement was going to auto renew[.]" (*Id.* at 38). As discussed above, however, there is a question of fact as to whether Zoe's gave Forsyth clear notice of its intent to terminate the Agreement. Moreover, there is nothing to suggest Forsyth had any obligation to inform Zoe's about the auto-renewal provision in paragraph 4 of the

Agreement.  Thus, Zoe's has not established as a matter of law that Forsyth is equitably estopped from claiming Zoe's termination notice was insufficient.  Zoe's also has not established as a matter of law that Forsyth's conduct indicated its intent to waive its rights under the Agreement's notice provision.  Zoe's is not entitled to summary judgment based on the doctrine of equitable estoppel or waiver.

## IV. Conclusion

Based on the foregoing, Forsyth's motion for summary judgment (Doc. 29) is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, Forsyth's motion is granted only with respect to Zoe's counterclaim for breach of contract to the extent the claim is based on Zoe's allegation that Forsyth breached the Agreement by failing to provide Zoe's with custom programming assistance.  The remainder of Forsyth's motion is denied.  Zoe's motion for partial summary judgment (Doc. 33) is **DENIED**.

DONE this 10th day of April, 2017.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE